## *In re* BERRIEN'S WILL.

(*Supreme Court, General Term, First Department.* December 29, 1890.)

1. WILLS—ATTESTING WITNESS—VERBAL RENUNCIATION OF LEGACY.
   On a contest of the probate of a will, objection was made to an attesting witness on the ground that he was a legatee under the will, whereupon he stated that he renounced all right to the legacy. *Held*, that the bequest became ineffectual, and he was a competent witness.

2. WILLS—TESTAMENTARY CAPACITY—EVIDENCE.
   A will executed by testatrix when about 83 years of age, soon after leaving the house of her daughters, with whom she had resided for several years, and removing to the residence of her son, where she remained until her death, a little more

than a month, gave her property to her son and his children, although, by a will made more than a year previously, the whole was given to her daughters. Her signature to the later will was defective, but this was due apparently to her very defective sight. One of the attesting witnesses, a physician, testified that at the time of the execution of the will he conversed with her to ascertain her mental condition, and concluded that she was of sound understanding. The two others, lawyers, one of whom had drawn the will from her instructions given to him on the preceding day, agreed that she appeared to be rational, and to understand the business she was transacting; and several others testified that her previous conversation and conduct had been rational and intelligent, particularly in regard to the execution of a deed and a power of attorney to her son to manage her affairs, and in giving him information as to her property; and this was substantially uncontradicted. The reason assigned by her for excluding her daughters from participation in her property was that they had misused and restrained her; and there was testimony that this was the fact. The evidence on behalf of the daughters, contesting the probate, was that these complaints were without foundation; that testatrix suffered from different diseases, and her bodily health was quite infirm; acts and expressions of hers on several occasions were shown, which indicated want of mind and memory, and upon which a physician testified that she was affected with senile *dementia;* but it appeared that, while her mind was subject to derangement at times from the disturbed state of her health, in the intervals she was reasonably rational and intelligent. *Held,* that her testamentary capacity was sufficiently proved to entitle the will to probate. Affirming 5 N. Y. Supp. 37.

Appeal from surrogate's court, New York county.

Petition for probate of the will of Rachel Berrien, deceased, by Benjamin G. Berrien, the executor named therein. Eliza S. Baker and Nancy C. Berrien, contestants, appeal from a decree admitting the will to probate. For former reports, see 5 N. Y. Supp. 37, and 9 N. Y. Supp. 942.

Argued before VAN BRUNT, P. J., and BRADY and DANIELS, JJ.

*Howe & Hummel,* for appellants. *Cyrus A. Peake,* for respondent.

DANIELS, J. The instrument in controversy was dated on the 19th of June, 1888. At the time of its execution the testatrix was about the age of 83 years, and she then resided in the family of Benjamin G. Berrien, her son, to whom, and her grandchildren, she gave nearly all of her estate. She died on the 25th day of July, 1888, leaving an estate of the value of about $2,000. Besides her son and grandchildren, she left surviving her two daughters, who have appealed from the surrogate's decree. To these daughters she gave no part of her property by her will, and they contested the application for its probate on the ground that the instrument had not been executed, or freely executed, by her, and that she was not at the time of sound mind, memory, or understanding; and that she had been induced to subscribe the instrument, if she did it all, by undue influence, fraud, and coercion. Shortly prior to the time of the execution of this instrument the testatrix was a member of the family of her daughter Eliza S. Baker, with whom the other daughter also resided. She remained in that family between one and two years, and about 4 o'clock in the morning, in the early part of June, she left that house through an unsecured window, and went to a neighbor's, a short distance therefrom. There she remained for about eight days, when she was taken, with her own consent, to the residence of her son, where she afterwards resided until the time of her decease. On the 23d of April, 1885, she executed another will, in which she gave her property, after the payment of her debts and funeral expenses, to those two daughters, nominating the husband of her daughter Mrs. Baker as her executor. At that time, therefore, her disposition and intention evidently was that they should be the recipients of her property; and the fact that her intention in this respect was afterwards so radically changed as to exclude them, and to donate all her property upon her son and his children, with a slight exception, awakens a suspicion, at least, that her conduct in this respect may have been improperly influenced. But this was met and explained by evidence indicating her condition and intention when she executed the paper in controversy, and of ill-treatment alleged to have been received

by her while she was an inmate of the family of her daughter Mrs. Baker. Upon these subjects a very large amount of evidence was taken, but it was not heard by the surrogate, but by his assistant, and then reported to him for his final action upon the application to probate the will. The case is accordingly to be considered on the effect of the evidence as it has now been brought before this court, for it has the same means of considering the evidence as the surrogate himself had, the witnesses not appearing or testifying before him. In the final disposition of the case the practice prescribed by the Code of Civil Procedure has not been followed; but, as all the evidence and proceedings have now been brought before this court, and each party, through their counsel, has submitted their views, this mere informality should not be allowed to stand in the way of a final disposition of this controversy.

The burden was upon the proponent of the will for probate to establish the fact, not only that it had been subscribed by the testatrix, but also that the other legal formalities prescribed by the statute had been observed, and that she was at the time a person of testamentary capacity. To meet this obligation, the three witnesses who attested the execution of the instrument were sworn and examined in the surrogate's court. They were persons of intelligence and fair character, certainly; two of them being members of the bar, and one a member of the medical profession. The instrument itself was drawn by Mr. Peake, one of these three witnesses; and he testified that it was so drawn on the day preceding its execution, and that the testatrix had dictated or stated to him the persons to whom she designed to give her property, and the articles to be given to each as they appeared in the instrument drawn by him. It was also testified that this instrument was read over to her after it was drawn, and that she expressed her approval of what had been done. On the following day these three witnesses, together with the son of the testatrix, were present, for the purpose of having the instrument executed by her; and Mr. Miles, who was a physician, testified that he conversed with her, to ascertain and discover what was then her mental condition, and, from the conversation which took place, concluded her to be a person of sound mind and understanding; and the testimony of the other persons who were present directly tends to sustain this statement of the doctor. The paper in controversy was produced, and it is stated by the persons who were present that she subscribed her name to it, although in a defective and partially illegible character, owing, apparently, in some degree, to her very defective eyesight; and that after that had been done, either in answer to an inquiry made by Mr. Peake or of her own volition, she declared the instrument to be her last will and testament, and requested these persons to subscribe it as witnesses, which they then and there did in her presence. These witnesses agreed that her conduct and conversation appeared to them to be rational, and that she understood the business which she was at the time transacting; and her son, who was the proponent of the will, gave evidence of the same general description. His testimony was objected to when this subject was reached, on the ground that he was incompetent, being one of the legatees named in the will. But all that was given to him by its language was one Boston rocking-chair; and when this objection was taken to his competency as a witness he stated that he renounced all right to this legacy, and upon that the objection was overruled, and the contestants, by their counsel, excepted. This objection was also from time to time repeated and directed to other portions of the testimony of this witness; but it does not appear to be capable of being sustained, for, the article intended to be given to him, being personal property, could certainly be rejected and refused in this manner. The gift itself was necessarily dependent upon his acceptance of it, and, when he declined to do that, then it became ineffectual. The law upon this subject has been stated to be that, "as a gift is not perfect at law until ratified by the assent of the donee, and a disclaimer operates merely as evidence that such assent was never

given, and that the estate consequently never vested in the donee, it would seem to follow that a single expression of dissent by the donee, though it were only by a parol declaration, would be sufficient to avoid the gift." Hill, Trustees, (3d Amer. Ed.) 331. And the principle has been stated still more positively in 1 Perry on Trusts, (2d Ed.) in section 270, where it has been stated that "it is now established that a parol disclaimer is sufficient in all cases of a gift by a deed or will of both real and personal estate." And this has been sustained certainly by the tenor, if not by direct adjudication, of the authorities. *Townson* v. *Tickell*, 3 Barn & Ald. 31; *Small* v. *Marwood*, 4 Man. & R. 181, 189, and note containing a very fair statement of the cases, and the principle considered to be maintained by them; *King* v. *Wilson*, 5 Man. & R. 140; *Peppercorn* v. *Wayman*, 5 De Gex & S. 230; *Doe* v. *Harris*, 16 Mees. & W. 517, 520; *Com.* v. *Mateer*, 16 Serg. & R. 416. It is true that in these cases the disclaimer was by writing, but the opinions of the courts proceed upon the theory that this degree of formality was not absolutely essential, certainly where the property intended to be donated is personal. And the same degree of approval of this legal theory is contained in *Roseboom* v. *Mosher*, 2 Denio, 61, 68–70, where the authorities underwent a very liberal degree of examination. And it follows from them, as well as the reason of the principle, that a gift of personal estate, rejected by the donee, cannot be held to be effectual either in law or equity; and the result is that this person was a competent witness to give evidence upon the hearing of the case. To prove the mental capacity of the testatrix it was further shown that she had executed a power of attorney and a deed of an undivided interest in a parcel of land shortly before the time when this instrument was subscribed and witnessed, and that conversation took place between herself and the counsel who drew and was present at the execution of these papers indicating her complete understanding of their contents. It was also stated, and such no doubt was the fact, that her daughter Mrs. Baker was present at the time when the power of attorney was executed, and endeavored to induce the testatrix to decline its execution. But this effort on her part was ineffectual, and her mother refused to listen to her remonstrance, and censured her for the treatment she had received while a member of the family of Mrs. Baker.

The object of the power of attorney was to authorize her son to manage her affairs; and under its authority he brought an action of replevin to recover the personal property of the testatrix which was left by her at the residence of Mrs. Baker at the time when she took her departure, and evidence was given showing that she stated where the articles would be found, and what they were, which it was the object of the suit in replevin to recover; and that these articles were found at the residence of Mrs. Baker, as the testatrix stated they would be. When she left that residence she went to the house of Mary Hallinan, where she remained for eight days. This was on the way to the residence of her son. And while she was at this house Mrs. Baker endeavored to induce her to return to her own house, but the testatrix refused to do so, asserting that she had there been misused. The testimony of Mrs. Hallinan is also to the effect that she conversed with the testatrix at different times while she remained at her house, and that her memory was good, and her conversation intelligent. And such also was the evidence of Doctor Darlington, a witness who was sworn and examined on behalf of the proponent, and visited the testatrix at the house of Mrs. Baker, both as her friend and her physician. He stated that he had repeated conversations with her, and that he considered, in substance, that she was rational and intelligent, but suffering from bodily diseases. The clergyman, Nathaniel Thompson, gave similar evidence, and so did Moses Burbank, whom she readily is stated to have recognized when he called upon her at the residence of Mrs. Baker. And the evidence of Peter B. Berrien is in the same direction. Another incident connected with the execution of the instrument in contro-

versy was her refusal to leave anything to her grandson Bennie; and that, she stated, was induced by the fact that she had at one time loaned him four dollars, and when she asked him to pay it, he not only laughed at her, but refused to do so.    The testimony of these witnesses as to what took place at the time when the power of attorney and the deed were executed, and when the will was drawn and it was executed and witnessed, is substantially uncontradicted by the other evidence contained in the case; and it tends very decidedly to prove the fact to be that the testatrix fully understood what she was doing, and intended to dispose of her property as that has been directed by this instrument.    The reason assigned by her for excluding her daughters from participation in the property is that they had misused her, and had restrained her in the house of Mrs. Baker, not permitting her to go, when she desired to do so, to the residence of her son.    And the testimony, not only of Mr. Peake, to whom the statements of the testatrix were made, but that of the physician Thomas Darlington, the witness Thomas Tighe, Mary Hallinan, Benjamin B. and Sarah E. Berrien, tends directly to prove this to have been the fact, and that it had impressed itself to such an extent on the mind of the testatrix as to induce her to exclude these two daughters from participation in her property.

The testimony of the daughters themselves, as well as that of Alonzo Baker and Wilbur S. Baker, the husband and son of Mrs. Baker, is that she was well and kindly treated at their residence, and that the complaints made by her were destitute of foundation.    Further evidence was given by the witness Edman that the testatrix, although previously well acquainted with him, did not recognize him when he called upon her at the residence of Mrs. Baker.    And upon the evidence of these witnesses the position has been taken that her complaints were imaginative, resulting from delusions, and that her mind had become so far impaired as to render her incapable of making a valid will.    And upon this subject the evidence of the physician Frederick W. O'Brien was taken very much at large, as it was also for the purpose of trying and criticising the preceding witness, Thomas Darlington.    The witnesses who were members of Mrs. Baker's household concur in their statements that the testatrix, while she was there, suffered from different diseases, and that her bodily health had become quite infirm, and that she had on several occasions indulged in acts and made expressions indicating the want of mind and memory.    Among these were the fact of her throwing a step-ladder and other articles down-stairs, breaking the windows of a stove, destroying a geranium plant, and drumming on the table in her room with boys' drumsticks, and the language used by her on different occasions, which is described as being abusive, obscene, and contradictory, and of her departure at one time from the house and her discovery afterwards at a stone-quarry, which, however, seems to have been between this residence and the home of her son.    Various questions were propounded to Dr. O'Brien as to the indications arising out of this language and these acts, and he expressed himself repeatedly that she was a person affected with what was called "senile *dementia*," arising from advanced age and these bodily infirmities.    But, while this evidence afforded ground for concluding that her mind had become the subject of derangement, it still appeared from what was stated by the witnesses on the part of the contestants that this was not constantly the condition of the testatrix, but that it resulted from the disturbed state of her health at the time, and that in the intervals she was reasonably rational and intelligent.    Upon this subject the witness Miss Berrien states that on one occasion a person called upon the testatrix whom she failed to recognize, but a few days before that the same person was in there and saw her, and was talking with her, and she seemed quite sensible.    She further testified that it was not a matter of fact that they kept her confined in the house and would not let her go out, and then added: "Only when she was in her

wild spells, when we were afraid that she would escape and injure herself. She was at liberty to go wherever and whenever she wished. When she had these spells on her she might get herself into harm." Mrs. Baker also gave similar testimony, in which she stated: "I never attempted to prevent her from leaving the house only at times when she had these wild spells, and when she was in a sick condition, and was not fit to go." She also testified, when in a state of excitement in these fits that the last witness that has been examined has described, "she would look generally quite wild out of her eyes, and her eyes didn't look natural, and she would talk a great deal to herself." And, on the occasion when the windows of the stove were broken, she states that the testatrix "seemed to be very wild when we went up to look." And also that "when she had a wild spell we kept the windows and doors fastened." The witness Ellen Flanigan also testified that sometimes she would be very wild, and a number of times she was quite right, and that she had these violent spells most every week one or two days, sometimes a week, and sometimes three weeks. The witness Edman referred to the same condition, in which he stated that her health under these spells was very poor. And other evidence was given that when not affected by them she conversed and acted rationally. And the testimony of Dr. O'Brien, in connection with this other evidence, would seem to warrant the belief that she was not in a demented condition, for in the intervals between her wild spells, which were identified with more than usual severity of her bodily diseases, she was not affected with these mental disturbances, for he stated that he thought a senile dement once is a senile dement always, which is not consistent with the theory presented by this evidence on behalf of the contestants, for that discloses the fact to have been that during the intervals between these infirm and wild conditions so often designated as "spells," the testatrix had the rational control of her faculties. And the evidence given on behalf of the proponent very clearly discloses the fact to have been that it was in an interval of this description that this power of attorney, deed, and will were executed.

On each of the occasions connected with the drawing, reading, and execution of the instrument in controversy the testatrix exhibited a fair amount of mental strength and understanding. She is shown so have comprehended what was in the instrument, and that it was drawn in the pursuance of her express instructions, and that the reasons leading to the exclusion of her daughters was the treatment that she had received at their hands. Her complaints of this treatment were made at times when the witnesses attesting them agree that her conversation was rational, and her memory appeared to be good. And the fact that she repeated these complaints as frequently as she did, when she was rational and her mind was active, confirms the conclusion that her accusations against her daughters, although in some respects exaggerated, had a sufficient foundation to excuse her in judgment of law for excluding them from all interest in her estate. There was some other evidence given, but not equal in importance to that which has been referred to, tending to exculpate the contestants, and to charge the son with ill-treatment of his mother; and there is reason for believing that this charge was well founded, but it had not proceeded so far as the acts of the daughters, which were still more recent, and for that reason more effectual in controlling the intention of the testatrix. Her aversion to them, and her indisposition to return, stating that she would prefer to die in the street, fully explain the motive leading to their exclusion under the will. And, as the testatrix was clearly not affected by either of these wild spells mentioned by the contestants and their witnesses at the time when the instrument was executed by her, but is shown by the attesting witnesses, as well as by the evidence of her son, who was present, to have been entirely free from every affection or disability of that nature, the conclusion appears to follow that she did possess that degree of mind and memory requisite to the making of her will, and freely, intelligently, and in-

tentionally made this disposition of her property. The causes assigned inducing her to do so transpired after the making of her will in 1885. They lead to an entire change in her design; and, as she has given expression to it in this instrument, and was at the time competent to understand it, and freely and voluntarily made it as the result of her own inclinations, the surrogate was right in admitting it to probate, and the decree should be affirmed, with costs.

All concur.